No. 93-396

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

DICK LEWIS, d/b/a DICK LEWIS
ELECTRIC SERVICE,

       Plaintiff and Appellant,

  v.

DENISE HUYSER, ANTHONY HUYSER, BARBARA
HUYSER, AIMEE HUYSER, JOHN C.
MALPELI, JR., and BOB BIGGERSTAFF,
d/b/a BIGGERSTAFF CONSTRUCTION,

       Defendants and Respondents.



APPEAL FROM:  District Court of the Eighteenth Judicial District,
              In and for the County of Gallatin,
              The Honorable Thomas A. Olson, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

          James J. Screnar, Attorney at Law,
          Bozeman, Montana

      For Respondent:

          Wayne Jennings, Attorney at Law,
          Bozeman, Montana

Submitted on Briefs:  December 16, 1993

Decided:  March 15, 1994

Filed:

_____
Clerk

Justice William E. Hunt, Sr., delivered the opinion of the Court.

Plaintiff/appellant, Dick Lewis, appeals from a judgment of the Eighteenth Judicial District Court, Gallatin County, finding that his actions in refusing to continue the contract were a breach of the parties' construction contract and awarding respondent, Biggerstaff Construction, its costs, disbursements, attorney fees, and ordering release of its posted bond on the subject property.

Affirmed and remanded for a determination and award of respondents' additional attorney fees on this appeal.

The dispositive issue is whether appellant breached his contract with respondent Biggerstaff Construction when he refused to continue work because of his belief that the work required of him would be in violation of Montana building codes, and his further belief that the parties' contract was unlawful.

Appellant Lewis is a licensed electrical contractor with his principal place of business in Big Sky, Gallatin County, Montana. Respondent Biggerstaff is a building contractor whose principal place of business is also in Big Sky. John Malpeli, Jr., is a developer of the property, San Marino Subdivision, at issue in this case. Denise, Anthony, Barbara, and Aimee Huyser are the current record owners of the San Marino Subdivision. The subdivision consists of eight residential lots, upon which Malpeli developed eight single-family log residences with common areas. The units in San Marino Subdivision are not commercial buildings or buildings to house five or more families.

2

In 1989, Malpeli contracted with respondent to construct the homes. Respondent proceeded with construction of the units as needed by Malpeli, with several units under construction at one time. Later in 1989, respondent and appellant entered into a real estate improvement contract in which appellant was to provide electrical supplies and perform the electrical services on the units. Appellant's tasks included completing the "rough-in" phase of the electric wiring and ordering an inspection from the state electrical inspector when the wiring was completed. The rough-in phase consists of installing all of a building's meter services, wiring, and electrical boxes and circuits before installation of insulation and interior walls. As the electrical contractor, appellant had the option of ordering a preliminary inspection of the rough-in phase of the wiring. Respondent and appellant agreed that their contract price was $5302. From 1989 to early 1990, appellant completed electrical work on four of the units. In March 1990, appellant began work on the fifth unit.

On about May 7, 1990, respondent's construction supervisor was asked by the purchaser of unit three to remove kitchen cabinets being stored there for later placement in unit five. In so doing, the construction supervisor hung the cabinets in unit five after installing tongue and groove boards and covering a portion of the wiring, despite appellant's warning not to do so.

Portions of the wiring in the first four units which appellant had completed also had been covered, but the electrical inspector

3

had not required that all the wiring be visible upon inspection of the rough-in wiring.

Appellant discussed the boards covering the wiring in unit five with several of respondent's employees. The employees suggested to appellant that the work in unit five remain covered until the state electrical inspector was ready to view the work. Appellant did not accept this proposal and refused to proceed with the job until respondent's employees removed all the wallboards covering the wiring in unit five. Appellant contended that if they did not remove the wallboards, he could lose his electrical contractor's license because the action was illegal. For several days and nights, appellant checked to see if respondent's employees had removed the wallboards covering the rough-in wiring, but they had not.

On May 12, 1990, appellant met with respondent and another of respondent's employees at respondent's office. Appellant had not contacted the state electrical inspector prior to this meeting. At the meeting, appellant became agitated and complained that the covered wires in unit five had jeopardized his electrical contractor's license. Respondent informed appellant that some of the wallboards had been removed. Respondent testified that throughout the meeting he attempted, without success, to work out a resolution with appellant in order to get him to finish the job. However, when appellant told respondent that he already had contacted an attorney about a construction lien for the work he had completed, respondent informed appellant that he should leave his

4

office. Before leaving the office, appellant presented a prepared bill to respondent for the services he had provided on the project, stating that he had completed about 55 percent of the wiring for unit five and that he was through with the project.

Appellant did not return to the job. He contacted the state electrical inspector to inform him of the conflict and to discuss the situation. The inspector told appellant that the covered wiring would not jeopardize the inspection or appellant's electrical contractor's license.

Respondent gave appellant several weeks to cool down, but appellant did not return. Respondent then hired a substitute electrical contractor to finish the job. In order to complete the job, the substitute electrical contractor was required to determine where all the wires ended, locate dead shorts, supply the fixtures which appellant had retained, and complete the wiring. Their bill to respondent to complete work on unit five and the remaining units was $5344, or $42 more than the total of respondent's original contract with appellant.

On May 16, 1990, after appellant left the project, he filed a notice of right to claim lien with the Gallatin County Clerk and Recorder for electrical services and electrical fixtures he had provided for unit five. The amount of the lien was $2916.10. Appellant testified that he had installed meter services to the unit as early as two months prior to May 12, 1990. The construction lien statutes required appellant to file his lien no later than 20 days after he first provided services or supplies.

5

Appellant mailed the notice to Malpeli more than 20 days after he had begun work on the project.

On December 5, 1990, and May 7, 1992, respondent posted two substitute bonds to replace and release appellant's lien on the subject property, totaling one and one-half times the amount of the lien.

On May 3, 1993, the District Court found that appellant breached the parties' contract without justification because appellant left the project after the electrical inspector had informed him that if no other problems existed, appellant could complete the rough-in and the inspector would not order a compliance, and would approve it. In addition, the court found that nothing had prevented appellant from completing the rough-in and calling for an inspection of the wiring, other than his failure to keep his temper under control. On June 8, 1993, the court entered its judgment awarding respondent $42 in damages, $251 in costs and disbursements, and $3931.50 in attorney fees, pursuant to § 71-3-124, MCA. The court also awarded the Huysers and Malpeli $250 in costs and disbursements, and $810 in attorney fees. Further, the court ordered that respondent's posted bond, which had replaced and released appellant's construction lien, be released to respondent.

On July 2, 1993, appellant filed this appeal from the judgment of the District Court.

Did appellant breach his contract with respondent Biggerstaff Construction when he refused to continue work because of his belief

6

that the work required of him would be in violation of Montana building codes, and his further belief that the parties' contract was unlawful?

Appellant asserts that respondent flaunted the law and performed an illegal act when it covered up the rough-in wiring in unit five which in turn prevented him from future performance of the parties' contract. Appellant also asserts that respondent's actions violated his responsibility as an electrician and jeopardized his electrical contractor's license.

Appellant contends that the effect of the District Court's decision is to allow general contractors to interfere with electrical contractors' responsibilities and legal duties.

Montana's Building Code Bureau guides electrical contractors and electrical inspectors regarding rough-in inspections as follows:

> COVER (ROUGH-IN) INSPECTIONS (1) Cover (rough-in) inspections are made by a state electrical inspector wherever possible. Insulation and wallboard shall not be applied before inspection unless 48 hours, excluding Saturdays, Sundays, and holidays, have expired after notice to inspect has been received.
>
> (2) Whenever violations are found upon inspection, the inspector will notify the installer verbally or with a written compliance order as to the nature of the violations. [Emphasis added].

8.70.405, ARM.

Appellant argues that the statute clearly prohibits covering the rough-in electrical wiring by insulation or wallboard before an inspector may waive a called-for inspection. Although the regulation provides that electrical wiring shall not be covered

7

before inspection, a reasonable reading is that the rough-in cannot be covered at the time of the inspection, and that the electrical inspector, in his discretion, may waive an inspection of covered rough-in wiring.

The record is clear that the parties had established a course of conduct allowing for the covering of some of the rough-in wiring in some of the other units completed before unit five, and that the electrical inspector approved. In addition, the former chief electrical inspector for the State of Montana, who was the inspector in the spring of 1990, when problems on unit five first arose, testified that an inspector must be given discretion in complying with the regulations:

Q: Is it physically possible for Mr. Lamke [the electrical inspector in Gallatin County] within a forty to forty-five hour week to do every inspection called for in the code?

A: I wish it were. No it isn't.

Q: Okay. And that's understood right from the beginning, isn't it?

A: Yes, sir.

Q: Now, the administrative rule that Mr. Screnar read to you contemplates some discretion on the part of the inspector does it not?

A: Yes, sir.

At trial, appellant acknowledged that electrical inspectors are vested with discretion as to whether they will inspect all of the wiring prior to some of it being covered up. In addition, he testified that the wiring in the ceiling and all the wiring around

the window and door openings in unit five had been covered prior to an inspection, based on a pre-agreement with the inspector.

The record is clear that appellant had been assured by the Gallatin County Electrical Inspector that the covered work in unit five was not a problem, and he gave no indication that he would issue a verbal or written warning or compliance order to appellant. The inspector testified that the technical violation by respondent in covering some of the rough-in wiring in unit five was not very serious. In fact, respondent removed some of the wallboards, as requested by appellant, in unit five before appellant left the job. Yet, appellant did not return. Because respondent cooperated by taking down the wallboards in unit five and attempted to resolve the problem by the time the parties met to discuss the situation on May 12, 1990, respondent did not interfere with appellant's responsibilities as an electrician.

As to appellant's argument that respondent's actions jeopardized his electrical license, the regulations do not provide that an electrical contractor's license can be suspended or revoked because the wiring is covered prior to inspection. Reasons for which an electrical contractor's license may be suspended or revoked are:

> (1) violation of this chapter, the national electrical code, or the rules of the [state electrical] board [Title 30, chapter 68];
> (2) any cause for which issuance of the license could have been denied had it existed and been known to the board;
> (3) commission of any act of gross negligence, incompetency, or misconduct as may be determined by the board in the practice of a master, journeyman, or

9

residential electrician or the business of an electrical contractor; or

> (4) making a material misstatement, misrepresentation, or fraud in obtaining a license.

Section 37-68-321, MCA. Respondent's actions did not jeopardize appellant's electrical contractor's license.

Finally, appellant was not prevented from completing the project by any other of respondent's actions. Both appellant and respondent testified that no one at Biggerstaff Construction told him that he could not finish the project. The evidence is that respondent asked appellant to complete the job. No other evidence was presented at trial to indicate that respondent jeopardized appellant's electrical contractor's license.

Appellant was not reasonable in his assumption that the situation as of May 12, 1990, prevented him from performing the contract and jeopardized his electrical contractor's license. After respondent removed the wallboards in unit five and offered solutions to the problem at the May 12 meeting, completion of the parties' contract was in appellant's hands alone. Appellant's obligation was to act in good faith and observe reasonable commercial standards of fair dealing in the trade. Section 28-1-211, MCA; Kuhns v. Scott (1993), 259 Mont. 68, 75, 853 P.2d 1200, 1205; Story v. City of Bozeman (1990), 242 Mont. 436, 450, 791 P.2d 767, 775. After May 12, 1990, when appellant still refused to perform the remainder of the contract, he did not act in good faith.

10

In addition to the foregoing arguments, appellant argues that the parties' entire contract is void because the object of the contract was unlawful. He cites case law interpreting rules against unlawful contracts and the Montana Uniform Commercial Code to support this proposition. Appellant's application of the UCC, applicable to the sale of goods, is misplaced. Further, nothing in the parties' contract was contrary to an express provision of law, contrary to the policy of express law though not expressly prohibited, or otherwise contrary to good morals. Section 28-2-701, MCA. We hold that the parties' construction contract was not unlawful.

In sum, we hold that appellant breached the contract and justified respondent's recovery and release from his posted bond.

Affirmed and remanded for a determination and award of respondents' additional attorney fees on this appeal.

_____
Justice

We concur:

_____

_____

_____

_____
Justices

11

March 15, 1994

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

James J. Screnar
Angel, Screnar, Coil & Bartlett
125 West Mendenhall
Bozeman, MT  59715

Wayne Jennings
Attorney at Law
P.O. Box 1625
Bozeman, MT  59715

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
    Deputy